OVERTON, J.
Plaintiff was born on March 20, 1889. His mother was Fannie Williams, a colored woman, who at the time of plaintiff’s conception and birth was unmarried, and his father was Dave Murdock, a single man, of the Caucasian race. Plaintiff lived *148 with his mother until her death, which occurred in the year 1896. The mother acknowledged plaintiff orally as her child, cared for him, and held him out to the world as such. When his mother died, plaintiff was then only 7 years of age. His grandmother, Eliza Williams, after the mother’s death, took charge of plaintiff, and cared for him until he grew old enough to care for himself. Eliza died in 1918, some years after plaintiff had grown to manhood.
In 1919, Helen Potter, the defendant herein, who is the daughter of Eliza Williams and the sister of plaintiff’s mother, Fannie Williams, was sent, upon her own application, by an ex parte judgment of the district court, into possession of th& estates of both Eliza and Fannie Williams, as the sole and only heir of the decedents, both of whom died intestate.
Plaintiff contended in the court below that the ex parte judgment sending defendant into possession of both estates should be vacated and annulled, and that he should be placed in possession of the estate of his mother as her only heir, and that, as the heir of his mother, and as her representative in the succession of Eliza Williams, he should be placed in possession of an undivided half interest in and to that estate, and that defendant, as the daughter of Eliza Williams, should be placed in possession of the remaining undivided half interest therein, and in that court obtained judgment accordingly. In this court, plaintiff recognizes that, since he claims to be nothing more than the acknowledged or natural child of Fannie Williams he cannot inherit, as representing her, an interest in her mother’s estate, under the ruling made in Hawkins v. Williams, 146 La. 529, 83 South. 796, and accordingly has abandoned that part of his demand. He still urges, however, his right to inherit the estate left by his motherl Defendant denies plaintiff’s right to inherit from his mother, and urges several reasons why he cannot.
The first reason urged why plaintiff cannot inherit from his mother, Fannie Williams, is that, under the laws existing at the time of the opening of her succession, he was barred from recognition as her heir. The basis of this contention is that, when the succession of Fannie Williams was opened by her death in 1896, marriage between white persons and persons of color was prohibited, and because of this inhibition plaintiff did not have, and could not have had, on the date his mother died, which, in law, is considered as the date of the opening of her succession, the status of an heir, a status which he must have then had in order to enable him to inherit from her.
There can be no question but that for one to be an heir he must have had that status at the moment the succession of the one from whom he claims was opened, for article 950 of the Civil Code provides that:
“The incapacity of heirs is the absence of those qualities required in order to inherit at the moment the succession is opened. He who wants these qualities at this time cannot be the heir.
“It is at the moment of the opening of the succession that the capacity or incapacity of the heir, who presents himself to claim an intestate succession, is considered.”
The foregoing article of the Code has been applied and enforced by this court in the cases of Lange v. Richoux, 6 La. 560, in the Succession of Hebert, 33 La. Ann. 1099, and in other cases unnecessary to cite.
From the article, of the Code, above quoted, and from the decisions, above cited, it is clear that we must look to the laws, in force at the time of the opening of the succession of plaintiff’s mother to determine whether or not plaintiff may be recognized as her heir. Referring to those laws for that purpose, we find that illegitimate children were at that time, as they are now, permitted to inherit from their mother, to the exclusion of her ascendants and other lawful kindred, provided that such children were duly ac *150 knowledged by her, and provided also that she left at her death no lawful children or other legitimate descendants. Civil Code, art. 918. We also find that parents, who at that time had illegitimate children, might acknowledge them, if they saw proper, as they may do, now, provided that the parents were not incapable of contracting marriage at the time the children to be acknowledged were conceived. Civil Code, arts. 202, 203, and 204, When plaintiff was conceived, which was in the year 1888, there was no law in force prohibiting marriage between a white person and a person of color. Plaintiff’s father and mother were not related. Both were single. Therefore, there was no legal reason why they could not have contracted marriage at the time of plaintiff’s conception; and hence, it would seem to follow, under the provisions of articles 202, 203, and 204 of the Civil Code, that it was within the power of plaintiff’s mother to have acknowledged him as her child, at the time of her death, or at any time between that ,date and plaintiff’s birth, and thereby to have given him the status of her heir, unless it be that Act No. 54 of 1894, which prohibits, among other marriages, those between white persons and persons of color, when considered in connection with other laws, rendered ineffective the acknowledgment of plaintiff, if made.
The act of 1894 was passed 6 years subsequent to plaintiff’s conception, and approximately 2 years before the death of plaintiff’s mother. Therefore it was a law in force at the time the succession of the mother of plaintiff was opened by her death, but, while that is so, is it a law that should be applied, under article 950 of the Civil Code, quoted above, in determining whether one, who was conceived before its passage, and who claims to be an heir, has the quality of an heir? We do not conclude that it is. True, in applying article 950 of the Code to determine whether one claiming to be an heir is in fact such, we must consult the laws in force at the time o^, the opening of the succession and, if we find as a fact in the case that one claiming to be heir was born outside of wedlock, then we must ascertain by the laws in force at the time of the opening of the succession, as we have done, whether such a person may be called to the succession, and if so, under what circumstances, and if we find, as we have, that a child although born outside of wedlock may be called to the succession of his mother, provided she could have, and has in fact, acknowledged him, we must next ascertain whether she could have acknowledged him, and, in ascertaining whether she could have done so, we are directed, by necessary implication, arising from the laws in force at the time of the opening of the succession, governing acknowledgment, to wit, by the implication arising from articles 202, 203, and 204 of the Civil Code, to consult, not the laws in force at the moment of the opening of the succession, providing who might or who might not then marry, but the laws in force, regulating marriage, at the time the person claiming to be heir was conceived, and if we find from those laws that the parents might have lawfully contracted marriage at the time the one claiming to be heir was conceived, then,we are to hold that the claimantwas such a person as might have been acknowledged, and thereby given the quality of an heir. To hold otherwise would be to violate the laws in force at the time of the opening of the succession, which.direct us, in effect, to ascertain by the laws governing marriage, in force at the time of conception, whether the child was capable of being acknowledged.
Defendant, however, cites the Succession of Hebert, 33 La. Ann. 1099, and takes the position that, since we there held that the acknowledgment of a child born put of wedlock, of parents, one of whom was white and the other colored, was valid, notwithstanding the fact that the law in force, at the time of, *152 the conception of the child prohibited marriage between white persons and persons of color, and that, as we recognized the validity of the acknowledgment in that case, because of changes brought about by constitutional and legislative provisions enacted subsequent to the conception of the child, among which were enactments repealing the laws prohibiting marriage between members of the two races, we should hold by a parity of reasoning that, when the bar was again raised against such marriages, a child conceived before the raising of the bar has not the quality entitling it to acknowledgment, although its parents were capable of contracting marriage at the time the child was conceived.
We think, however, that a careful reading of the opinion in the Hebert Case will show that the ruling made therein rests upon the theory that the purpose and effect of the legislation, referred to in the opinion, was to do away completely with the barrier that existed against the marriage of a white person and a person of color, and with such barrier as an impediment to the acknowledgment or the legitimation of illegitimate children, conceived before the legislation mentioned was adopted, and therefore the court decided the issue as if no such barrier had ever existed. In other words, the court gave a retroactive effect to a law in favor of the status of the innocent offspring, and cited as a precedent the case of Girod v. Lewis, 6 Mart. (O. S.) 559, wherein it was held that, although the marriage of slaves produced no civil effect flowing from the marriage, yet that, upon the emancipation of the parties to the marriage, the very contract of marriage, which, when entered into, produced no civil effect, immediately became susceptible of producing full civil effect.
If it could be held that Act 54 of 1894 was intended to have a retrospective effect a different situation would doubtless arise, but in our view the act contains nothing that indicates it was intended that it should have such effect, or, in other words, that indicates that it should be interpreted as preventing the acknowledgment of an illegitimate child, conceived before its passage, or as taking away from such a child, conceived at a time when its parents were capable of contracting marriage with each other, and duly acknowledged, the rights of an acknowledged child.
In the Succession of Yoist, 132 La. 309, 61 South. 384, a kindred question was before the court. The record in that case disclosed that Yoist, a member of the white race, and Eudora Bergeron, a woman of color, lived together in concubinage from 1870 until Yoist’s death in 1910. Two children were born to them, both of whom were conceived when their parents were capable of contracting marriage with each other. Yoist, in 1905, first acknowledged the children as his, and then legitimated them by notarial act. The question arose in his succession as to whether he could legitimate them, in 1905, after the promulgation of Act 54 of 1894, and it was held that he had the right to do so by notarial act, and having done so that the children were entitled to the status of heirs in his succession; the court refusing, to give to the act of 1894 the retroactive effect of prohibiting legitimation, in such a case, by notarial act, though it was unmistakably true that the children could not have been legitimated by the marriage of their parents, since, in 1905, the parents could not have married one another. And again, in the Succession of Segura, 134 La. 84, 63 South. 640, a question similar to the one in the Yoist Case arose. In the Segura Case it appeared that Segura, a white man, and Mary Miles, a colored woman, had lived together in concubinage from a time prior to the Civil War until the death of Mary Miles in 1912, and of this illicit union four children were born, all of whom, with the exception of one, *154 were conceived at a time when their parents, under the laws then existing, were incapable of contracting marriage, as one of the parents was white and the other colored. In 1912, Segura, by notarial act, legitimated the children. When Segura died, the children claimed the rights of heirs in his succession. It was contended by some of Segura’s collateral relatives, who claimed to be his heirs, that, since the passage of Act No. 54 of 1894, prohibiting marriage between members of the two races, a white man could not legitimate, by notarial act, children bom of an illicit union between him and a colored woman. It was, however, held that he could, since Act No. 68 of 1870, which permits fathers and mothers of illegitimate children to legitimate them, by notarial act, when the only impediments to the marriage of the parents at the time the children were conceived were those resulting from color or the institution of slavery, had not been repealed by Act 54 of 1894.
Since, therefore, Act No. 54 of 1894 does not repeal or affect the right of a father or mother of illegitimate children to legitimate them by notarial act, and thereby give them the status of forced heirs, it would be inconsistent to hold that the act prevents the father or mother of such children, one of the parents being white and the other colored, from acknowledging them, and thereby giving the children the status of irregular heirs, since legitimation, when it may take place, not only creates a higher class of heirs than mere acknowledgment creates, but necessarily includes acknowledgment.
It is true that, in the Succession of Davis, 126 La. 178, South. 266, the opinion rendered is susceptible of being interpreted as giving to Act 54 of 1894 the effect of preventing the acknowledgment of children, conceived before the passage of the act, when one of the parents is white and the other colored, at least when the case is considered in connection with the Succession of Hebert, cited supra, upon which it is made to partly rest, but, in so far as there may be any conflict between it (the Davis Case) and the views herein expressed, the Davis Case must be considered as overruled.
Also, in the Succession of Vance, 110 La. 760, 34 South. 767, expressions are found, which indicate, at least, that an illegitimate child, conceived before the passage of the act, cannot be legally acknowledged by parents, one of whom is white and the other colored, after the passage of the act, but those expressions are merely obiter dicta, for the case was expressly decided, not with reference to them, but upon the ground that the child had not been legally acknowledged by the father, in whose succession she claimed to be a testamentary heir.
From the foregoing, our conclusion is that plaintiff had the quality that rendered it possible for him to have been legally acknowledged by his mother, and thereby given the status of an heir in her succession, and that, while his mother did not die until after the promulgation of Act 54 of 1894, yet there is nothing in that act that is destructive of an acknowledgment already made, or that even prevents the acknowledgment of an illegitimate child, conceived before the promulgation of the act, and that plaintiff, under the laws in force at the momeiit of the opening of his mother’s succession, had the capacity of an heir in that succession, provided, of course, it appears that he was duly acknowledged by his mother.
Defendant also contends that the only method by which plaintiff’s mother could have recognized plaintiff was by legitimating him as provided by Act 68 of 1870, that is, by an act declaratory of the intention to legitimate him, passed before a notary public and two witnesses. However, defendant is in error in this respect. It is sufficient to say that the act of 1870 does not repeal the laws *156 governing the acknowledgment of illegitimate children. Those laws still remain in force, and have been frequently applied since the passage of that act.
The second reason urged by defendant as to why plaintiff cannot recover is that his status is that of a bastard and not that of a duly acknowledged child. Under this heading, the sole argument made by defendant is that, as plaintiff was never acknowledged by Ms father, his status remains that of a bastard, and as such he cannot inherit from his mother, notwithstanding her acknowledgment of him, if, in fact, she did acknowledge him. Defendant cites, in support of her position, article 202 of the Civil Code, which reads as follows:
“Illegitimate children who have been acknowledged by their father are called natural children; those who have not been acknowledged by their father, or whose father and mother were incapable of contracting marriage at the time of conception, or whose father is unknown, are contradistinguished by the appellation of bastards.”
And defendant also cites, in support of her position, article 920 of the Civil Code, which reads as follows:
“Bastard, adulterous or incestuous children shall not enjoy the right of inheriting, the estates of their natural father or mother, in any of the cases above mentioned, the law allowing them nothing more than a mere alimony.”
On the other hand, article 203 of the Civil Code reads:
“The acknowledgment of an illegitimate child shall be made by a declaration executed before a notary public; in presence of two witnesses, by the father .and mother, or either of them, whenever it shall not have been made in the registering of the birth or baptism of such child.” (Italics ours.)
And article 922 of the Civil Code reads:
“The estate of a natural child deceased without posterity, belongs to the father or mother who has acknowledged him, or in equal proportions to the father and mother, when he has been acknowledged by both of them.” (Italics ours.)
The definition of the word “bastard,” found in article 202 of the Civil Code, is qualified by articles 203 and 922, quoted above. When the three articles are construed together, it is clear that a mother may acknowledge her illegitimate child whether or not the father is willing to acknowledge, or has acknowledged, the child. See Succession of Hebert, 33 La. Ann. 1099; Minor v. Young, 148 La. 610, 87 South. 472. If the child may be, and has been, acknowledged by the mother, it is equally clear that the child may inherit from her. C. C. art. 918.
The last reason urged why plaintiff should not recover is that he has not been formally acknowledged, as provided by article 203 of the Civil Code, quoted above, which provides that the acknowledgment shall be made by declaration before a notary public and two witnesses, when it shall not have been made in the registry of the child’s birth or baptism.
Plaintiff does not contend that a declaration of acknowledgment was made by his mother in the registry of his birth, or in that of his baptism; but; as we have stated in the first part of this opinion, it appears that his mother recognized him as her child, cared for him, and held him out to the world as such. The evidence justifies the conclusion that she so held him out and cared for him from his birth in 1889 until her death in 1896. The acknowledgment thus made was ample, if acknowledgment may be made otherwise than as provided by article 203 of the Civil Code.
The question as to whether acknowledgment may be made otherwise than as provided by the cited article of the Code has often been decided by this court, and the ruling made that an illegitimate child may prove that it has been acknowledged by its mother without showing that the acknowledgment *158 was made in the mode prescribed by article 203. Lange v. Richoux, 6 La. 570; Jobert v. Pitot, 4 La. Ann. 305; Succession of Hebert, 33 La. Ann. 1099; Succession of Fortier, 51 La. Ann. 1584, 26 South. 554; Bourriaque v. Charles, 107 La. 217, 31 South. 757; Briggs v. McLaughlin, 134 La. 133, 63 South. 851.
In Minor v. Young, 149 La. 583, 89 South. 757, the court took a contrary view, from the foregoing, but granted a rehearing because of the question here under consideration. Pending the rehearing the suit was adjusted amicably and, by consent, a decree was entered reinstating the judgment originally rendered. As the original judgment was reinstated by consent, it cannot properly be considered as precedent on the question that influenced the granting of the rehearing, which is the one now under consideration.
The question again arose in the case of Taylor v. Allen, 151 La. 107, 91 South. 635, and it was again held, after considering the jurisprudence of the state on the subject, that proof of acknowledgment of an illegitimate child by the mother could be made by a mode different from that prescribed by. article 203 of the Code. The jurisprudence, so holding, is of long standing; and, as was said in the case last cited, “it constitutes stare decisis.”
For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from, in so far as it recognizes plaintiff as a joint heir, with defendant, of Eliza Williams, deceased, and as such places him in possession of an undivided half interest in all property left by her, be annulled and set aside, and that plaintiff’s demand in that Respect be rejected; and it is further ordered and decreed that the judgment, appealed from, in all other respects be affirmed; plaintiff to pay the costs of appeal, and defendant those of the lower court.
Rehearing refused by Division B, composed of DAWKINS, LAND, and LECHE, JJ. ,